Case number 24-5898, Robert OLaughlin v. Radiation Therapy Services, PSC, et al. Oral argument not to exceed 15 minutes per side. Andrew Grosso for the appellant. You may proceed. Good morning. Good morning, Your Honors. My name is Andrew Grosso. I represent Dr. Robert OLaughlin in this case arising from the Eastern District of Kentucky. I would ask for two minutes for my rebuttal. Very well. I'd like to start talking about the Chemotherapy Council. We in the court below demonstrated using multiple documents from two sources that there was no way there could be physicians on the premises on certain dates and in some instances at certain times. And yet these Medicare and Medicaid claims were billed as if there were physicians on the premises billing at higher rates than they should have been billed at. All right. I mean the argument is that physicians could have been approving these charges remotely or there could have been substitute or temporary physicians that were approving it. How do you counter those arguments? For chemotherapy they could not be approved remotely. There had to be somebody present. Because chemotherapy is dangerous, introducing any agent into the bloodstream can be dangerous. There must be a physician on the premises providing direct supervision. So that somebody having been hired, locum tenens, we know the dates that those physicians were hired. Specifically Dr. Bertram was hired from January 5th to February 4th. Dr. Batra was hired May 12th through May 21st and June 10th through June 25th. Now for these particular set of claims, we are talking about the period December 26th when Dr. Hayek left and July 1st when three other physicians were hired full time. During the six month period in between there were large gaps when there were sufficient physicians in order to handle. So I take it the court thought and the court found that your theory on the chemotherapy relies on your reading of these master schedules. Is that right? I believe the court thought that those and that the testimony was undisputed that these master schedules did not purport to be the end-all be-all on when the physicians were at the facilities. I guess I'm curious what your response is to that because it seems like it just comes down to these master schedules. No, it was in dispute. There were several people who testified and I'm talking about Jessica Dove who was a nurse at that time at the clinics and Katrina Holliman, another one, who said that is how you could determine which physician was present treating a patient at a certain clinic on a certain day. Even Dr. Jane, the lead defendant, testified that you could use the schedules for that purpose. He switched his testimony. I thought he testified that there was a way that you could do it in order to find the way, I guess, you had to cobble together a number of different sources in order to figure out when physicians were there and that the master schedules were not the way to do that. He contradicted himself. At one point, and this is in the brief, at one point he said you can't use, that's not used for that purpose, but he also said you can use the master schedules and he said that twice. So two to one, at least you have a contradiction in his own testimony. Then you look at the testimony of the nurses and you get additional support for the plaintiff's position. Now granted, Teresa Kintagos, who was an administrative assistant, went the other way. So we have an administrative assistant versus two nurses who are on site and you have Dr. Jane who went both ways. I think that is a disputed testimony and supported by the master schedules that are the clinic's own records so they can be used against the clinics. On the one hand, Nurse Dove seems to me to be a strong witness that there were some problems, let's say, but she isn't able or isn't pressed to identify any particular times, places, and patients. I guess my wonder is that given all of the things that you discovered and how long that you had to deal with them, that you are not able to identify a particular date with a particular patient. That is, I take it from your point of view, the doctors, did they sign something affirmatively saying, you know, I performed this service or I was there on a given date? We have the billing records. So those are done by bureaucrats in the office, they don't have a doctor's signature? Well, according to Manish Jain, the business manager for the offices, that information went directly from the electronic health records into the billing system. Okay. The electronic health records give a particular doctor's name? Yes. Okay. So then shouldn't you have been able to say, Dr. X is given as the doctor for this patient on this day when he could not have been there? We use the Medicare and Medicaid billing records, reimbursement records to be precise, in order to do exactly that. And those are in the tables that were provided in summary judgment motions. The tables are these charts that counsel, spreadsheets that counsel prepared? Yes. And you would say, if I look at that carefully, I will see that it says that on June 23rd, Dr. Jain billed for this patient when he was not there for a given patient? Yes. But the important thing is whether there is a doctor there or not. And these records were used to demonstrate that physicians were not at certain premises. I mean, I get your mathematical argument, and it might have some validity, but it sounds like you're saying that there was an allegation of a particular doctor and a particular patient. Is that what we should take from it? We are proving there is a negative that a doctor who was listed as having provided a service could not have provided the service. We have records that show both doctors are at Highlands. Meanwhile, services for chemotherapy are being provided at Ashland. We have the reverse. And particularly on Thursdays, when all the doctors were supposed to go to tumor board meetings, there are numerous Thursdays throughout the period in question. They're supposed to go to a meeting, but do you have proof that they were at the meeting? They're blocked out on the records for Ashland. As a lawyer, my schedule might show I'm getting my necessary CLE, but I never signed in at the CLE program. I wasn't there. I was scheduled to be there, but guess what? I didn't show up. I mean, you've got an inference that they fouled the schedule, but that's not definite proof that they did. It's enough for a jury question. Okay, but basically all you have is the inference that the schedule says they were supposed to be there, so we infer that they fouled the schedule. And they say, well, you need something better than that. We don't need, if we get to trial, we don't need that. It's your proof. I mean, you have the burden of proof, right? Preponderance of the evidence under a false claim. But also, this is not an ordinary jury trial, because you have a heightened pleading standard. You have to show the who, what, when, where, and a particular false claim. We sort of come back to that, what I call your mathematical proof, which might be persuasive. It still doesn't get you to a particular claim. So for that, you say we have to go back to the spreadsheets. A heightened pleading standard is for the pleading. We are beyond that for the clinical therapy claims. We are getting ready to go to trial, and the standard is preponderance of the evidence that's specified in the False Claims Act. Are you going to use those spreadsheets, are they going to be exhibits at trial? Yes. As like summary documents under 1006? Yes. Who's going to testify about them? You? No. I hope not. Who prepares for the case? They're allowed to cross-examine whoever prepared the documents, I take it. They're allowed to cross-examine whoever is introducing and explaining the documents. This is not a confrontation issue under the Sixth Amendment, not a criminal case. No, I'm not saying it is. I'm just saying that just as a matter of normal litigation, you're allowed to find out the methodology, which claims were picked and why, and that would involve the person who prepared and selected the entries for the summary document. Anyone who understands it. My of counsel, who has not entered a Notice of Appearance, worked with me on this. He can do it. Dr. Laughlin was involved. He can do it. Whoever understands them and can explain them and can submit himself to cross-examination on how they're put together and what they mean is qualified. If this was a criminal case, I would agree that it needs to be the person who prepared it. But Dr. Laughlin, it's odd to me that he then should be able to pinpoint just one or two specific examples of, hey, there was a Thursday meeting and Dr. Jane was at this meeting, and I know that they billed for his chemotherapy services at Ashland or something. This happened on Thursday, May the 1st, 2013 or whatever it is. I don't see that testimony at all. Well, he left in 2015. Okay, pick whatever year you want. I don't see that testimony anywhere. He testified in 2023, around seven years later. Okay, but he didn't keep any notes. He doesn't have anything to refresh his recollection. He just kind of knows generally that this was going on at the time that he worked there. Is that it? He knew. He knows that all the doctors, including Dr. Jane, would go to the tumor board meetings, for example. And we have the master schedules that have Dr. Jane and the other doctors blocked out. But if they testify, hey, normally I would go to this meeting, but if I had a chemotherapy, I wouldn't go to this meeting, that would take care of your argument, wouldn't it? That's in the nature of an affirmative defense. You don't have to prove it 100 percent or beyond a reasonable doubt or even clear and convincing. It's got to be a preponderance of the evidence. No, but it would be undisputed. If they said, hey, my practice was to go to this meeting, but you know what? Sometimes I actually had patient stuff, and so I would do that. And you would have to dispute that by saying, no, I know that you weren't there on Thursday, May the 1st, or you were at this meeting, and I know that you had a patient that you had to see, and you didn't do it, and we billed for it. And I guess I just don't see that contradictory evidence that would then put that issue in dispute. Well, first of all, the records that you're talking about were at Ashland Belafont Hospital. However, given the length of time that this case was held under seal and held in the control of the United States, those subpoenas did not go out until those records were gone. So as a result, what we have are the clinic's own records that show that these doctors were blocked out on those days. We have the testimony of Dr. O'Loughlin and I believe Dr. Hayek that people... I'm trying to think of the nurse's name. There was one other nurse who testified, Steffesen, that they all went to the tumor board meetings, including Dr. Janning, all the physicians, and all of the nurse practitioners at Ashland, not at Highlands. There was left behind a nurse practitioner at Highlands, but no physician at all at Ashland during that period of time. So they... not even a nurse practitioner. And that's consistent. There may have been exceptions, but I would suggest that if there's an exception based on this type of evidence, that it is up to the defense to correct. Now if I... happy to answer any further questions on this, but I'd like... Oh, you'd like to what? Well, I don't have any time left, so I guess I don't like... Well, what would you like to do? I want to talk about the Leukine injections on weekends. There were no doctors there. If there was a doctor there, it was for some kind of an emergency, a radiation emergency where a patient had to get treated quickly. And we have the Medicaid and Medicare billing records. If there was a doctor billing on a weekend on that day, we backed it out of the claim that we're alleging. Leukine is a chemotherapy service. It may not be a chemotherapy drug, but it is part and parcel to the regime of treating cancer with chemotherapy. It is covered by the American Medical Association in the CPT manual that a physician should supervise this, must supervise this, and they billed as if it was being supervised under the name of a doctor. Any further questions at this point, Judge DelBene? All right, you'll have your two minutes for rebuttal. Thank you, Your Honor. Good morning. Good morning. Thank you, Your Honors. May it please the Court and counsel, this is a false claims act case. Commissioner Melton? Yes, yes, Your Honor. Chris Melton for Appalese. This is a false claims act case, and the Sixth Circuit Law and False Claims Act is very clear on this, on what is required to be proven. There has to be actual damages. Conjecture, theories are insufficient. There has to be actual damages, and there has to be proof of a claim that has been submitted. And this case was pending for several years. It went through multiple iterations of pleading, and it went through over a year of discovery. And time and again, the appellants were asked to please identify what you are saying were false claims, and they never were able to do it. Dr. O'Loughlin himself was asked at his deposition probably about two and a half weeks before discovery closed, as you sit here today, can you tell us one claim that was submitted that was false, and he could not do it? And even as discovery was ending, we asked one more time, we asked again, in written discovery, can you... But his argument is that everything that's listed on the spreadsheet is a false claim. Well, part of the problem is we didn't get the spreadsheet until after discovery had closed. And he had an expert, he had... Well, did you ask to reopen discovery? Did you say, hey, I need to depose this guy, I need to figure out who did this, I need to... I mean, you sent interrogatories, right, to Dr. O'Loughlin about the spreadsheet? We didn't have a spreadsheet to ask him about... Okay, but what... I understand you think there's a procedural problem, but there were some... There were motions to compel all kinds of things going back and forth here. So did you ask to reopen discovery? Like, what would you have gotten? What is it that you didn't get that you should have gotten? The problem here is that these spreadsheets are not actually a... I know they're characterized as a 10.06 summary exhibit, but if you read the appellant's briefs, it tells a different story. These were an analysis. This was a triangulation of different variables to arrive at these dates and times and whatnot. And so it is... Well, I mean, I guess what I would say is maybe it pushes the limit on what a 10.06 document is, but I take it everything in the document is based on some admissible evidence. There's a claim. They pinpoint a claim that was made. They pinpoint the date. They pinpoint whatever else there is, what the amount was. And so I take it they're saying based on the master schedule that there was no doctor that was scheduled to be there, so ipso facto, this is a false claim. So they are saying it's a false claim. So they are giving some evidence, I suppose, that it's a false claim. And so I don't know what... And I understand you got it after the close of discovery, but I guess I'm saying what... I mean, I'm not sure what your argument is. Are you just saying we should ignore that or... I mean, you made a motion to strike it. The district court didn't really strike the document. It just said, hey, it's not really reliable because the master schedule doesn't say what they say it says. So, I mean, that's kind of where we are. But I guess I'm saying, I don't know that they have no evidence of it or haven't identified any false claim. They haven't... Dr. O'Loughlin couldn't say, yes, on May 1st there was a false claim, but they did give this list of alleged false claims. Well, I will say that, to restate that, I would say that there was no identification of false claims while discovery was pending. Just wanted to clarify that I may not have put it that way, but... Well, he's also bound by his admissions at his deposition, is he not? He can't contradict his own deposition testimony by contradictory evidence, can he? And that's actually one of our challenges here. And to answer your question, that's correct. Even what goes into these spreadsheets, and that's, to your point, the district court found them to be completely unreliable. And part of that is, and it even came out today, he's saying that Dr. O'Loughlin testified that all of the physicians went to these tumor board meetings every Thursday. But in reality, Dr. O'Loughlin's testimony was that he said, no, they were a waste of time. He said, I miss them all the time. He said, they didn't have them every Thursday. That was undisputed testimony, that they didn't occur every Thursday. Dr. O'Loughlin said, he didn't go to them all the time. He said they were a waste of time. He even said, at one point, he said, if I were seeing to a patient at Logan, the West Virginia clinic, or one of the other clinics, then I would see to those patients. Well, the only other clinic is in Highlands, which is the one that he says no one was ever at on Thursday. So his own testimony contradicted What about the testimony about the master schedule and whether it's probative at all of whether somebody was in a certain place at a certain time? All of the testimony was that these master schedules are patient-centric. They are supposed to list what patient is seeing what doctor. They're made in advance by the front desk. It is not necessarily a listing that says, this doctor will be at this place at this time. That was undisputed. That was the testimony that came out. It's not probative at all of whether that doctor is going to be at that place at that time. If it's listed at that, it's my patient, it's on the master schedule, I understand it can change. But it's not going to change every time. I mean, so can't we, couldn't a jury infer that, yes, okay, it's at least probative of whether somebody was going to be there. And if there was, you know, it's not on the schedule, but there's a bill for it, maybe that was a false claim. I think it's probative of what the original intent of what people's schedules and days were going to look like. And obviously those change over time. As far as whether or not it goes to a jury question, the problem here is that he has to, the appellant's duty is to identify specific dates and times that someone wasn't present in the facility. And were there calendars for each doctor? Were those produced? I mean, I'm confused about why this was such an issue about where a doctor is at a certain time. The challenge we had with this case was that it was under seal for a large period of time with DOJ. And so whether or not there were at some point some calendars, I think that probably what had happened was the master schedules probably were the calendars, but I don't think any of the doctors kept a calendar of saying, I am here on this particular date. And there weren't actually all of the, a lot of the records did not, weren't in, that may have been in existence, weren't in existence at the time that discovery had, or even at the time that we were aware. Was it clear, was it clear that this master schedules were not altered contemporaneously? In other words, if I was blocked out to come on Wednesday and not come on Thursday, and it turned out, you know, I broke my leg so I didn't come in on Wednesday, but I healed and then I came in on Thursday, would that have been recorded or does everybody agree that they were not updated by the actual events? All the testimony that is in the record was that it was not updated. If Dr. Jane was scheduled to see a patient and Dr. Hayek instead saw the patient because Dr. Jane was held up at a different clinic, the front office didn't go in and change that. Or if the patient didn't come in at 2 but instead came in at 5. That's correct, that's correct. The other issue with this is that I want to be clear on this because I think that it was a little bit confusing during Appellant's time of argument. When we're talking about chemotherapy, we're not talking about a physician's service. The physician doesn't give, administer, the physician doesn't push the chemo, that's a  The only thing that's required is a physician in the facility while it's happening. The proverbial doctor in the house. So when you see the billing record that says, you know, billed for chemotherapy and it might have Dr. Jane's name on it, that's because Dr. Jane had ordered the chemotherapy. Not necessarily that Dr. Jane was the supervising physician because when you bill for a service and this is what's called a technical service because it's done by someone other than a physician, when you bill for that you have to certify for the medical necessity of that service. And if Dr. Hayek is there and he may never lay eyes on the patient if the patient doesn't get sick while they're getting chemotherapy, Dr. Hayek wouldn't certify the medical necessity, Dr. Jane would as the ordering physician. So whoever the physician was that ordered the chemotherapy, his name appears on it. That's why you might have situations in which Dr. Jane is in Highlands but you see his name on a claim form in Ashland that says that for a patient who got chemotherapy. It would be, there is a representation when you send the bill that there was a, you're agreeing that there is some representation to the government that there was a physician in the house. It just, that physician isn't necessarily named on the claim. That would be accurate. We would agree with that. But the physician who's on the form would be the one who ordered the procedure? Yes, yes. In most cases it would. The only difference would be if there's a situation of a locum and a locum tenens physician because that might have been a situation in which whoever the locum tenens physician is replacing, like for instance when Dr. Hayek had left and there were locum tenens physicians, it may have still had Dr. Hayek listed and that's for a myriad of reasons dealing with who's been allowed to be put on that for Medicaid and Medicare. But to also to turn the attention a little bit. Let me just catch that. Your upshot there is that everything would be fine if there were a locum was there even if we don't know who it was? That's correct. There's the discussion here about the Indian lady who has to be different from the doctors who were hired because they were male. That's absolutely correct. That's absolutely correct. And the assertion that there were only two locums was contradicted in the record. The Indian lady, I think there was reference to somebody named Ramone and Dr. Janikowski and a number of short term locums, all who were employed, that the record clearly showed from multiple witnesses that there were more than two locums. So to those spreadsheets just right there, those spreadsheets that have an entire category that deal with the times that there weren't one of these two locums present, that automatically supports what the district court's finding that these were unreliable. And the question to Dr. O'Loughlin to which he says he can't identify one, that is in the deposition which occurred before the spreadsheet is produced? That's correct. Although one might have thought that if he knew it was out there, he would say, oh yes, I can identify it and I'll get you the spreadsheet. That was our hope when we deposed him. Or maybe you were just a very good taker of depositions and you flustered him. I wouldn't want to give myself too much credence for that, but I do want to turn my attention a little bit to the Leukine issue. And this is laid out in the briefs. Appellant makes reference to the AMA, the American Medical Association, who comes up with these CPT codes. It is important to note that Leukine, again, is not a chemotherapy drug. And it is administered subcutaneously, which is under the skin. It's not intermuscular, it's not intravenously like chemo would be. It is an under the skin injection similar to, I think, what the testimony of the record talks about. It's similar to a diabetic giving himself an injection of insulin. Oftentimes it's self-administered. Chemotherapy is never self-administered. It is a, and in the cancer centers, the testimony of the record is, the cancer centers only gave Leukine in the office if a patient were, for whatever reason, not able to give it to themselves. Either not able, unwilling, or unable to. And the American Medical Association groups these CPT codes, and this CPT code, I think we may have actually mis-transposed some numbers in our brief as I look back over it. The correct CPT code is 96372. And when the AMA grouped these codes together, the range of 96365 to 96379 are under an umbrella titled Therapeutic, Prophylactic, and Diagnostic Injections and Infusions Excluding Chemotherapy. So the American Medical Association specifically excludes these from, this drug and its administration from chemotherapy. And when Dr. O'Loughlin was deposed on this of why is he considering Leukine to be part of chemotherapy, he was operating under his own working definition of what chemotherapy is, and his testimony was, without directly quoting it, was essentially anything that has a CPT code and is given to a chemotherapy patient, he would consider to be chemotherapy. And he was asked, would that include, say, if you gave a chemotherapy patient a flu shot, and he said yes. And that factors into the district court's decision that under no circumstance should a flu shot be considered chemotherapy. But that was, again, the sort of basis that was premised upon these spreadsheets. So the spreadsheets which were, outside of this time period of discovery, which were essentially expert testimony created by a lawyer in the case who can't testify to it, in addition to all those issues which were part of our Daubert motions we filed, they were also completely unreliable in their premise. And I see that I am out of time, and if you have any questions, I'm happy to entertain them. Any further questions, Judge Fox? No. All right. Thank you, counsel. Thank you, Your Honor. Two minutes rebuttal. Thank you, Your Honor. First point. Yes, there were additional locum tenants, not during the period of December 27th through June 30th. Dr. Manish Jain was shown the employment records of the locum tenants. He said those were the only ones during that period. The other locums were outside that period, and we're not concerned with that for these particular claims, what I call the weekday claims for that six-month period. So that does not affect the plaintiff's case. With regard to a physician in the facility, yes, there must be a physician in the facility. It doesn't make a difference which one it is. And we did not, in our third amendment complaint, we did not allege that the claims were false because any particular doctor was named. The claims were provided what? You're saying that on the master schedule there was no doctor scheduled to be in the facility? There's no master schedules for the weekends. There's nothing. No, I'm talking, okay, all right. With regard to production, discovery closed December 22nd, 2023. November 21st was the first time the defendants asked for claims. December 6th, they turned over 5,000 pages of documents that needed to be analyzed in order to determine those claims. February 6th, they turned over additional documents. So by the time we were able to finalize the claims, discovery was already closed. If there was any particular, and we've been asking for those documents for years. We had numerous motions to compel. With regard to the weight to be given to these business records of the clinics, they are business records, they're admissible. They are statements of a party opponent, they're admissible. The weight to be given to them is up to a jury to determine. So that should permit us to get past a motion for summary judgment. And with regard to Leukine, it's very interesting here. Yes, Leukine can be administered at home. Under the regulations, if that's the case, they should not have been billed at all under the name of a physician. So the entire amount is damage. They were bringing the patients in. Our theory is it was purposely so they could be billed by a physician, even though they didn't have to be provided by a physician. There were thousands of patients, not just a few special ones, as my opposing friend would have it. And we have an expert witness, Eileen Kuntz, who agrees with Dr. O'Loughlin that Leukine is a chemotherapy service, even though it's not a chemotherapy drug. The complaint explicitly alleged chemotherapy services, as well separately drugs. And Jessica Dove, who was a nurse at the facility who now teaches and trains this stuff at – this stuff is not quite a legal term, but this stuff at Ohio State University Hospital – both confirm that these are chemotherapy services when these injections are given. Does anybody have any questions? Any further questions, Judge Boggs? No. I thank you very much. All right, thank you for your argument, counsel. The case will be submitted.